NOTICE

Decision filed 04/21/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240889-U

NO. 5-24-0889

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 23-CF-172 |
| | ) | |
| JAMES J. LOMAX, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justice Sholar concurred in the judgment.
Justice McHaney specially concurred.

**ORDER**

¶ 1     *Held*:  The circuit court did not abuse its discretion in its denial of the defendant's motion for a mistrial. The defendant's constitutional challenge under the second amendment is without merit.

¶ 2     After a jury trial, the defendant, James J. Lomax, was convicted of armed violence and the offense of being an armed habitual criminal. The defendant was sentenced to two concurrent terms of 20 years' imprisonment in the Illinois Department of Corrections (IDOC). On appeal, the defendant argues that the circuit court abused its discretion in denying the defendant's motion for a mistrial where a law enforcement officer testified that the defendant was on mandatory supervised release (MSR) despite the circuit court's order *in limine* barring evidence of the defendant's MSR status. The defendant additionally argues that the armed habitual criminal statute is facially unconstitutional and as applied to the defendant under the second amendment and

1

pursuant to *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). For the following reasons, we affirm the judgment of the circuit court of Jefferson County.

¶ 3                                                    I. BACKGROUND

¶ 4       On June 19, 2023, a law enforcement officer, Detective Hails, with the Mt. Vernon Police Department, conducted a traffic stop of a Dodge Durango because the front seat passenger was not wearing a seat belt. The defendant was the only backseat passenger in the vehicle, and a Taurus G3 9-millimeter firearm was located in the third row seating of the vehicle, behind where the defendant was seated. Officer Hails also observed the defendant drink from a yellow cup during the traffic stop. The cup contained a purple-looking substance which later tested positive for codeine.

¶ 5       During the traffic stop, Detective Hails was aware that the defendant had a criminal history and his MSR status. In 2018, the defendant had been sentenced for five years to the IDOC and one year MSR for the offense of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2018)). The defendant's criminal history also included a conviction for aggravated unlawful possession of a weapon (720 ILCS 5/24-1.6(a)(1)(3)(D) (West 2012)). As a result of the traffic stop, the defendant was arrested and subsequently indicted for the offense of armed violence (720 ILCS 5/33A-2(a) (West 2022)) and the offense of armed habitual criminal (AHC) (720 ILCS 5/24-1.7(a) (West 2022)).

¶ 6       The jury trial began on January 30, 2024. After the jury was selected, the defense presented an oral motion *in limine* to bar any reference to the defendant's MSR status during trial. The defense argued that disclosing the defendant's MSR status would be prejudicial and unrelated to the traffic stop and vehicle search. The State argued that the only time the defendant's MSR status would possibly be referenced would be during the testimony of Detective Hails. The State objected

2

to limiting this testimony where Detective Hails was aware of the defendant's prior firearms charge when he conducted the search of the vehicle. The circuit court found that a juror may conclude that the defendant was a convicted felon based on any reference to MSR status, and therefore the testimony would be prejudicial and irrelevant. The oral motion was granted, and the State was instructed that the defendant's MSR status should not be referenced during trial.

¶ 7    After opening statements, Brandy Hays testified for the State. Hays was a police informant and was familiar with the defendant. During the afternoon of June 19, 2023, Hays had invited the defendant to her house and the defendant arrived with a handgun. The "butt" of the handgun was visible, protruding from the defendant's pocket of his pants. Hays discretely photographed the handgun in the defendant's pocket. She sent the photograph to Detective Troy Hails in a text message and informed Detective Hails when the defendant left her residence. In return, Hays received $100 from the Mt. Vernon Police Department for the crime tip. The defendant's face was not depicted in the photograph. Hays verified that the photograph she took was of the defendant. The photograph of a visible gun in the defendant's pocket was admitted into evidence.

¶ 8    Detective Troy Hails testified that he was employed through the Mt. Vernon Police Department as a narcotics detective. Detective Hails encountered the defendant on June 19, 2023, during a traffic stop of a Dodge Durango. The vehicle was stopped because the front seat passenger was not wearing a seatbelt. Detective Hails identified the defendant as the only backseat passenger in the vehicle.

¶ 9    When Detective Hails approached the vehicle, he observed the defendant making "furtive movements towards his right and rear of the vehicle." He further explained that the "furtive movements" were "movements in an attempt to hide or possibly hide something that could be an officer safety concern." Because of the safety concern, Detective Hails approached the defendant

3

in the backseat before addressing the driver of the vehicle. The defendant was directed to remove his hands from his pockets, and he complied. Detective Hails observed a "clear baggy" in the defendant's hands and believed that it contained cannabis. Detective Hails then addressed the other two occupants in the vehicle as additional officers arrived.

¶ 10    After additional officers arrived, Detective Hails returned to his vehicle to perform a search for possible warrants on the identified occupants of the vehicle. After Detective Hails testified that he performed the search of the individuals, the State asked, "What happened next?" Officer Hails responded:

> "Upon running [the defendant], I knew [the defendant] to be paroled MSR custody, supervised release. The driver ended up being valid, and they all returned clear of any warrants."

The defense did not immediately object to Detective Hails's reference to the defendant's MSR status.

¶ 11    Detective Hails continued to testify that he returned to the Dodge Durango to search the defendant and the other two occupants of the vehicle. Detective Hails additionally looked inside the vehicle in the area where the defendant was "making his furtive movements towards." A Taurus G3 9-millimeter firearm was located slightly to the right and behind where the defendant was seated.

¶ 12    During the traffic stop, Detective Hails had observed the defendant drinking from a yellow cup. The yellow cup was located in the backseat passenger area near where the defendant had been seated, and contained a "bluish, purplish substance." Detective Hails suspected that the substance was a narcotic. The yellow cup was packaged, and the substance was sent to the Illinois State Police crime lab for testing.

¶ 13    The recording of the stop was captured on Detective Hails's dash camera and was admitted into the evidence, along with photographs of the firearm and other illegal contraband located in the vehicle. Detective Hails was additionally shown the photograph of the gun in the defendant's pocket that Detective Hails had received from his "confidential source." Detective Hails acknowledged he was familiar with the photograph. The circuit court then took a recess before publishing the dash camera recording for the jury.

¶ 14    During the recess, the defense moved for a mistrial based on the testimony by Detective Hails that he "knew [the defendant] to be paroled MSR custody, supervised release." The defense argued that the circuit court had ruled that any evidence that the defendant was subject to MSR or parole was barred and this testimony was in violation of that ruling. The defense explained that a contemporaneous objection was not made in an effort to avoid highlighting the improper testimony to the jury, and that a curative instruction, at that point, would also highlight the improper testimony. The only remedy, according to the defense, was a mistrial.

¶ 15    The State argued that there was a 1988 case, *People v. Mays*,[1] which addressed a similar issue related to improper testimony. The State explained that according to *Mays*, an instruction to disregard evidence would cure the error where the improper testimony was not directly responsive to the question and the testimony was promptly stricken with an instruction to the jury to disregard the testimony. The State further argued that the defense had not made an objection when Detective Hails mentioned "MSR," and that the issue was no longer ripe for review. Had the defense timely objected, the State would have argued for a curative instruction to disregard the testimony where there was no evidence that the jury would not be able to follow instructions. The State additionally argued that the jury would learn, by way of stipulation, of the defendant's two prior qualifying

---

[1]See *People v. Mays*, 176 Ill. App. 3d 1027 (1988).

offenses required for the AHC charge, and that the evidence against the defendant was overwhelming. Thus, the prejudicial effect of Detective Hails referring to the defendant's MSR status was low.

¶ 16     The circuit court denied the motion for a mistrial. Outside the presence of the jury, Detective Hails was admonished regarding the pretrial ruling. When the jury reconvened after the recess, a curative instruction to disregard MSR testimony by Detective Hails was given to the jury before the evidence resumed. Specifically, the circuit court instructed the jury "that you are not to consider any reference made by Detective Hails to the defendant being paroled on MSR custody, or supervised release. You are to disregard that." Defense counsel noted that he "had no objection to the Court issuing a curative instruction in the manner outlined by the Court."

¶ 17     The dash camera recording was shown to the jury after the recess. Detective Hails was then shown a firearm, and he identified the firearm as the Taurus G3 9-millimeter with ammunition in the magazine that had been located inside of the Dodge Durango. He was also shown a "blue and purplish-colored substance." Detective Hails identified the substance as the same substance that he had collected from the yellow cup during the traffic stop. The firearm and the "blue and purplish-colored substance" were admitted into evidence and published for the jury.

¶ 18     Justin Osborn, a detective with the Mt. Vernon Police Department, testified that he was working on June 19, 2023, and was familiar with the defendant. Osborn was a backup officer during the traffic stop and took photographs of the scene. Osborn photographed a black Taurus G3 9-millimeter firearm that was located on the floorboard in the Durango behind where the defendant had been sitting in the SUV. He did not photograph the yellow cup.

¶ 19     Jeremy Reichert, a detective sergeant with the Mt. Vernon Police Department, testified that he swabbed the Taurus G3 9-millimeter firearm collected during the traffic stop for DNA. The

6

swab was sent to the Illinois State Police crime lab. Reichert was unable to develop a fingerprint profile from the firearm. Reichert was not surprised by the lack of unidentifiable fingerprints on the firearm and testified that he was able to find identifiable prints one or two percent of the time.

¶ 20   After Reichert's testimony concluded, three stipulations were read to the jury. The first was stipulated testimony of Bryan Tomac, a forensic scientist with the Illinois State Police. Tomac had tested the Taurus G3 9-millimeter firearm in evidence and determined that it was an operable firearm. The second stipulation was of the testimony of Jennifer MacRitchie, a forensic chemist with the Illinois State Police Drug Analysis Division. MacRitchie tested 7.5 grams of liquid collected from the yellow cup. The liquid tested positive for the presence of codeine. The third stipulation was for the testimony of Dana Pitchford, a forensic scientist with the Illinois State Police. Pitchford performed a DNA matrix analysis from a swab taken from the defendant and the swab from the Taurus handgun. Pitchford imported the raw data into an extraction worksheet report and provided the extraction worksheet report to Meredith Misker.

¶ 21   Meredith Misker testified at trial that she worked as a forensic scientist for the Illinois State Police. The foundation was laid, and she was qualified to testify as an expert witness in the areas of biology and forensic DNA analysis. She analyzed the DNA sample collected from the firearm and found a mixture of DNA from two individuals. The DNA profile from the firearm was 39 septillion times more likely that the mixture was the defendant's DNA and an unknown unrelated individual than a mixture of two unknown unrelated individuals.

¶ 22   After Misker testified, the parties stipulated that the defendant was previously convicted of two prior felony offenses that qualified as felonies for the charge brought pursuant to the AHC statute (720 ILCS 5/24-1.7(a)(3) (West 2022)). The State then rested. The defense moved for a directed verdict, which the circuit court denied. The defendant did not present witnesses, waived

7

his right to testify on his own behalf, and then rested. After closing arguments, the jury returned a guilty verdict for AHC and armed violence.

¶ 23    The defendant submitted a motion for a new trial and to vacate the jury verdict, and included an argument that the circuit court erred when it denied the defendant's motion for a mistrial. The circuit court denied the motion and proceeded to sentencing. The defendant was sentenced to two concurrent 20-year sentences in the IDOC. A motion to reconsider the sentence was submitted by the defendant and denied by the circuit court. This appeal followed.

¶ 24                                    II. ANALYSIS

¶ 25    On appeal, the defendant argues that the circuit court erred when it denied the motion for mistrial where the State violated the circuit court's pretrial ruling barring evidence of the defendant's MSR status. The defendant additionally argues that the defendant's AHC conviction is unconstitutional on its face and as applied to the defendant under the second amendment and pursuant to *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

¶ 26                            A. Motion for Mistrial

¶ 27    The circuit court had granted a defense motion *in limine* to bar any reference to the defendant's MSR status during trial. The defense moved for a mistrial after Detective Hails testified that he knew the defendant was "paroled MSR custody, supervised release." Rather than granting the mistrial, the circuit court provided a curative instruction to the jury to disregard Detective Hails's reference to the defendant being paroled on MSR custody, or supervised release.

¶ 28    A defendant's guilt or innocence should be judged only for the crime charged, not for other offenses. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). The erroneous admission of other-crimes evidence usually warrants reversal, but only if it is so prejudicial that it deprives the defendant of a fair trial and was likely a key factor in the conviction. *People v. Cortes*, 181 Ill. 2d 249, 285

8

(1998). If the error likely did not affect the jury, its admission does not justify reversal. *Cortes*, 181 Ill. 2d at 285.

¶ 29 A mistrial is proper where "an error of such gravity has occurred that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice." *People v. Bishop*, 218 Ill. 2d 232, 251 (2006). We review the denial of a motion for mistrial for an abuse of discretion. *People v. Pinkett*, 2023 IL 127223, ¶ 33.

¶ 30 In order to succeed on a motion for mistrial, the defendant must demonstrate prejudice and that a curative instruction from the circuit court would not remedy the damage from an improper comment. *Pinkett*, 2023 IL 127223, ¶ 33. If an objection is made at trial to improper questioning, the circuit court can sustain the objection or correct the error by instructing the jury to disregard the testimony. *People v. Hall*, 194 Ill. 2d 305, 342 (2000). The prompt sustaining of an objection by the circuit court is generally sufficient to cure any error in a question or answer before the jury. *People v. Jacobs*, 405 Ill. App. 3d 210, 220 (2010). And, jurors are presumed to have followed the circuit court's instructions. *People v. Birge*, 2021 IL 125644, ¶ 40.

¶ 31 Because Detective Hails referenced the defendant's MSR status, the jurors could infer that the defendant had a criminal history and had been released from the IDOC recently, which was arguably prejudicial to the defendant. We consider, however, that the defendant had been charged with the offense of AHC. Under the AHC statute, "[a] person commits the offense of being an armed habitual criminal if he or she receives, sells, possesses, or transfers any firearm after having been convicted a total of 2 or more times of any combination" of certain enumerated offenses. 720 ILCS 5/24-1.7(a) (West 2022). The AHC statute explicitly states that a prerequisite to a conviction for being an armed habitual criminal requires convictions for two prior qualifying felonies. See *People v. Gray*, 2024 IL 127815, ¶ 22. The jurors were, therefore, made aware that the defendant

9

had a criminal history because the parties had stipulated that the defendant's criminal history included two qualifying offenses.

¶ 32     The defense did not immediately object after Detective Hails referenced the defendant's MSR status. Rather, the circuit court recessed the proceedings during Detective Hails's examination, and the defense moved for a mistrial at that time. The defense explained that a contemporaneous objection was not made in an effort to avoid highlighting the improper testimony. The parties discussed the contentions of error and the circuit court determined that a curative instruction to disregard Detective Hails's reference to the defendant being paroled on MSR custody, or supervised release was sufficient to address the defendant's argument regarding prejudice. The defense did not object to the curative instruction proposed by the circuit court. The defense has not demonstrated that any potential error was not remedied where it is presumed that the jurors followed the instruction. See *Birge*, 2021 IL 125644, ¶ 40.

¶ 33     The evidence against the defendant was overwhelming. A photograph of the defendant with a gun was taken by an informant on the same day as the traffic stop. The defendant made furtive movements during the traffic stop in an "attempt to hide or possibly hide something." A firearm was located in the area of the vehicle near where the defendant had been seated and where the defendant appeared to have hidden something. Furthermore, the DNA evidence collected from the firearm was linked to the defendant. The DNA profile from the firearm was 39 septillion times more likely that the mixture was the defendant's DNA than an unknown unrelated individual's DNA.

¶ 34     Only one reference regarding the defendant's MSR status was made during the trial and the jury was instructed to not consider that remark. The defendant has not established that the statement resulted in an unfair trial. We therefore find that the circuit court did not abuse its

discretion when it denied the motion for a mistrial where a curative instruction was provided to the jury to disregard the reference to the defendant's MSR status.

¶ 35                                    B. Constitutional Challenge

¶ 36    We turn next to the defendant's facial and as-applied constitutional challenge to the AHC raised for the first time on appeal. "An as-applied challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party." *People v. Thompson*, 2015 IL 118151, ¶ 36. A defendant is required to raise an as-applied constitutional challenge before the circuit court and develop the record with specific facts and circumstances relevant to his claim. *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 57. However, if the record contains sufficient facts and circumstances to decide the defendant's claim, then the issue may be raised and reviewed for the first time on appeal. *Brooks*, 2023 IL App (1st) 200435, ¶ 57.

¶ 37    "In contrast, a facial challenge requires a showing that the statute is unconstitutional under any set of facts, *i.e.*, the specific facts related to the challenging party are irrelevant." *Thompson*, 2015 IL 118151, ¶ 36. A statute will be deemed facially unconstitutional only if there is no set of circumstances under which the statute would be valid. *Burns v. Municipal Officers Electoral Board of the Village of Elk Grove Village*, 2020 IL 125714, ¶ 13.

¶ 38    Statutes carry a strong presumption of constitutionality and the party making the constitutional challenge must clearly establish the invalidity of the statute to overcome this presumption. *People v. Mosley*, 2015 IL 115872, ¶ 22. "Courts have a duty to uphold the constitutionality of a statute whenever reasonably possible, resolving any doubts in favor of the statute's validity." *People v. Rizzo*, 2016 IL 118599, ¶ 23. Thus, if it is reasonably possible to construe the statute in a way that preserves its constitutionality, we must do so. *Rizzo*, 2016 IL

11

118599, ¶ 24. The question of whether a statute is constitutional is reviewed *de novo*. *People v. Aguilar*, 2013 IL 112116, ¶ 15.

¶ 39 The defendant challenges the constitutionality of the AHC, under which "[a] person commits the offense *** if he or she receives, sells, possesses, or transfers any firearm after having been convicted a total of 2 or more times of any combination" of certain enumerated offenses. 720 ILCS 5/24-1.7(a) (West 2022). The defendant challenges the constitutionality of the statute under the second amendment to the United States Constitution which provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II.

¶ 40 The United States Supreme Court in *Bruen* announced a two-part analysis for review of laws affecting the right to bear arms, and the standard for applying the second amendment is as follows:

> "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Bruen*, 597 U.S. at 24.

Simply, under *Bruen*, "the two-part process requires [this court] to determine (1) whether defendant's conduct falls within the plain text of the second amendment and, if so, (2) whether there is a justification for the regulation rooted in history and tradition." *People v. Travis*, 2024 IL App (3d) 230113, ¶ 24.

¶ 41 *Bruen* referenced the United States Supreme Court decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), which recognized that "the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *Bruen*, 597 U.S. at 8-9. *Bruen*

12

agreed that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 597 U.S. at 10. Courts have relied on *dicta* in *Heller* and in *Bruen* as evidence that people with felony convictions may be categorically excluded from the second amendment's protections where the second amendment right protects only "law-abiding" citizens. See *People v. Baker*, 2023 IL App (1st) 220328, ¶ 37 (finding that *Bruen* made it clear that its test applied only to laws that attempted to regulate gun possession of "law-abiding citizens" where this phrase was repeated 18 times in the majority opinion and concurrence).

¶ 42   We considered the *Bruen* analysis in *People v. Smith*, 2025 IL App (5th) 230656, which agreed with the reasoning in federal and appellate court decisions which concluded that "felons are not protected under the plain text of the second amendment." *Smith*, 2025 IL App (5th) 230656, ¶ 25. *Smith* found that "a defendant who is in the process of committing a felony while possessing an operational firearm does not fall into the category of 'the people' protected by the second amendment." *Smith*, 2025 IL App (5th) 230656, ¶ 25. Furthermore, numerous other Illinois decisions have addressed whether felons are protected by the second amendment. See *People v. Arrington*, 2025 IL App (5th) 230344-U, ¶ 43; *People v. Honorable*, 2025 IL App (5th) 220743-U, ¶ 30; *People v. Hudson*, 2025 IL App (5th) 231140-U, ¶ 19; *People v. Lopez*, 2025 IL App (1st) 232120, ¶ 22; *People v. McTizic*, 2025 IL App (1st) 240467-U, ¶¶ 8-13; *People v. Gray*, 2025 IL App (1st) 191086-B, ¶ 20; *People v. Whitehead*, 2024 IL App (1st) 231008-U, ¶¶ 85, 89; *People v. Thomas*, 2024 IL App (4th) 240315-U, ¶¶ 23-24; and *People v. Kelley*, 2024 IL App (1st) 230569, ¶¶ 16-22.

¶ 43   The Fifth District case, *People v. Stephens*, 2024 IL App (5th) 220828, followed the reasoning in a federal court decision in *United States v. Ware*, 673 F. Supp. 3d 947, 956 (S.D. Ill. 2023), and concluded that the defendant fell "into the category of 'the people' protected by the

second amendment," regardless of his status as a felon. *Stephens*, 2024 IL App (5th) 220828, ¶ 33. *Stephens* addressed the constitutionality of the unlawful use of a weapon by a felon statute (UUWF) (720 ILCS 5/24-1.1(a) (West 2022)) and found the UUWF statute to be constitutional on its face under the second amendment where "the State has met its burden of showing that section 24-1.1(a) is consistent with this nation's historical tradition of firearm regulation." *Stephens*, 2024 IL App (5th) 220828, ¶ 39.

¶ 44　We additionally consider the defendant's argument that other courts have held that the term "the people" in the second amendment applies to all people, including certain convicted felons and domestic abusers, citing *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (*en banc*), and *United States v. Prince*, 700 F. Supp. 3d 663 (N.D. Ill. 2023). The judgment in *Range* was vacated, and the case remanded to the United States Court of Appeals for the Third Circuit. See *Garland v. Range*, 144 S. Ct. 2706 (2024) (mem.). The *Prince* decision was reversed and remanded. See *United States v. Prince*, No. 23-3155 (7th Cir. 2026). Furthermore, decisions of the federal courts, other than the United States Supreme Court, concerning questions of constitutional law are not binding on Illinois courts. *Mekertichian v. Mercedes-Benz U.S.A., L.L.C.*, 347 Ill. App. 3d 828, 836 (2004).

¶ 45　We respectfully disagree with *Stephens*'s approach and follow the reasoning addressed in the *Smith* decision. See *Stephens*, 2024 IL App (5th) 220828, ¶ 33; *Smith*, 2025 IL App (5th) 230656, ¶ 25. The defendant is a convicted felon, and thus, not included as part of "the people" protected under the second amendment. Because the defendant cannot claim the protection of the second amendment, the defendant's claim fails under the first part of *Bruen*'s test. Therefore, the defendant has not demonstrated that the AHC statute is facially invalid under the second amendment.

14

¶ 46    Furthermore, because we have determined that the defendant is not a law-abiding citizen who is protected under the second amendment, we need not address the second step of the analysis in *Bruen*. Nevertheless, the defendant has additionally raised an as-applied constitutional challenge to his AHC conviction in the framework of the second part of *Bruen*'s test. The defendant argues that his prior qualifying convictions were nonviolent and only possessory in nature, and the State cannot demonstrate a historical justification for gun regulations based on nonviolent offenses.

¶ 47    The distinction between violent and nonviolent felonies for purposes of *Bruen* and the second amendment has been rejected. See *People v. Welch*, 2025 IL App (1st) 231116, ¶ 60 (holding the unlawful use or possession of a weapon by a felon statute constitutional, as applied to the defendant); *Travis*, 2024 IL App (3d) 230113, ¶ 37 (holding the AHC statute constitutional, as applied to the defendant); *Brooks*, 2023 IL App (1st) 200435, ¶ 100 (holding the AHC constitutional, as applied to the defendant, even though his prior felonies were nonviolent because the defendant was "not a law-abiding citizen"). *Travis* rejected the defendant's "invitation to second-guess the legislature's determination of which crimes merit felony status and, consequently, disarmament." *Travis*, 2024 IL App (3d) 230113, ¶ 37.

¶ 48    The defendant's status as a felon precludes firearm possession, regardless of whether his convictions under the AHC are classified as violent or nonviolent offenses. See *Travis*, 2024 IL App (3d) 230113, ¶ 37. We find the AHC statute facially constitutional and constitutional as applied to the defendant. Therefore, the defendant's claims to the contrary fail.

¶ 49                                 III. CONCLUSION

¶ 50    For the forgoing reasons, we affirm the judgment of the circuit court of Jefferson County.

¶ 51    Affirmed.

¶ 52    JUSTICE McHANEY, specially concurring:

¶ 53    I agree with the majority's ultimate conclusion. I write separately, because I believe the proper approach to the second amendment post-*Bruen* is set forth in *Stephens*.